Eric R. Havian (State Bar No. 102295)
ehavian@pcsf.com
Claire M. Sylvia (State Bar No. 138990)
csylvia@pcsf.com
Edward H. Arens (State Bar No. 259155)
earens@pcsf.com
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Tel: (415) 836-9000
Fax: (415) 836-9001

Attorneys for *Qui Tam* Plaintiff
[Under Seal]

FILED
2014 NOV 12 PM 2:29
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ORIGINAL

| | |
|---|---|
| UNITED STATES *ex rel.* [UNDER SEAL],<br><br>Plaintiffs,<br><br>v.<br><br>[UNDER SEAL],<br><br>Defendant. | Case No. CV14-08755SVW(FFMx)<br><br>COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. § 3729, *et seq.*)<br><br>JURY TRIAL DEMANDED<br><br>**FILED IN CAMERA AND UNDER SEAL (AS REQUIRED BY 31 U.S.C. § 3730(B)(2))** |

PAID
NOV 12 2014
Clerk District Court

FILED

2014 NOV 12 PM 2:29
CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY: ____________

Eric R. Havian (State Bar No. 102295)
ehavian@pcsf.com
Claire M. Sylvia (State Bar No. 138990)
csylvia@pcsf.com
Edward H. Arens (State Bar No. 259155)
earens@pcsf.com
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Tel: (415) 836-9000
Fax: (415) 836-9001

Attorneys for *Qui Tam* Plaintiff
[Under Seal]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

UNITED STATES *ex rel.* [UNDER SEAL],

Plaintiffs,

v.

[UNDER SEAL],

Defendant.

Case No. CV14-08755 SVW (FFMx)

COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. § 3729, *et seq.*)

JURY TRIAL DEMANDED

**FILED IN CAMERA AND UNDER SEAL (AS REQUIRED BY 31 U.S.C. § 3730(B)(2))**

1

Eric R. Havian (State Bar No. 102295)
ehavian@pcsf.com
Claire M. Sylvia (State Bar No. 138990)
csylvia@pcsf.com
Edward H. Arens (State Bar No. 259155)
earens@pcsf.com
PHILLIPS & COHEN LLP
100 The Embarcadero, Suite 300
San Francisco, CA 94105
Tel: (415) 836-9000
Fax: (415) 836-9001

Attorneys for
*Qui Tam* Plaintiff Peter Matthews

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES *ex rel.* PETER MATTHEWS,<br><br>Plaintiffs,<br><br>v.<br><br>NORTHROP GRUMMAN CORPORATION,<br><br>Defendant. | Case No.<br><br>COMPLAINT FOR VIOLATION OF THE FEDERAL FALSE CLAIMS ACT (31 U.S.C. § 3729, *et seq.*)<br><br>JURY TRIAL DEMANDED<br><br>**FILED IN CAMERA AND UNDER SEAL** |

Plaintiff-Relator Peter Matthews through his attorneys Phillips and Cohen LLP, on behalf of the United States of America (the "Government") alleges, based upon personal knowledge, relevant documents and information and belief, as follows:

## I. INTRODUCTION

1. This is an action to recover damages and civil penalties on behalf of the United States of America arising from false statements, records, and claims

made, presented, and caused to be presented by the Defendant and/or its agents, employees and co-conspirators in violation of the Federal False Claims Act, 31 U.S.C. § 3729, *et seq*., as amended ("the FCA").

2. The Relator alleges that Defendant Northrop Grumman Corporation ("Northrop") had actual knowledge of, recklessly disregarded, or acted in deliberate indifference to, credible information that the LN-120G stellar inertial navigational systems it supplied to the United States were not adequately sealed, allowing moisture to enter the system and degrade components. Although the specifications for the LN-120G included passage of a Helium Leak Test that would have detected such problems, and required repair and rework prior to delivery, Northrop failed to perform the test on any of the LN-120Gs it delivered. Moreover, Northrop repeatedly misrepresented that the test had been performed, when Northrop had never performed the test and in fact lacked the equipment to perform the test.

3. The Helium Leak Test requirement is critical because of the potentially dangerous effects of moisture entering the LN-120G system. Moisture has the potential to cause corrosion and other failures in the electronics that the LN-120G houses. The reconnaissance planes that use the LN-120G system are dependent upon the system's proper functioning both to ensure the plane's navigation and to identify the location of targets on the ground for other aircraft to strike. Given that failure of these systems could have serious consequences, the Government bargained for the assurance that the LN-120G would not suffer failures during its expected life. Although the minimum expected life without failures for the LN-120G is 4,000 hours, all or nearly all of the LN-120Gs have been returned because of failures in less than half that time.

4. To date, at least 50 LN-120Gs have been delivered to the Government at the cost of approximately $1 million each. Not one of the delivered LN-120Gs has been subjected to the required Helium Leak Test, notwithstanding Northrop's

representations that each LN-120G met that requirement. All or nearly all of the LN-120Gs have been returned for repairs caused or partly caused by moisture in the system. Defendant has never reported to the Government that it had not performed, and indeed could not have performed, the required Helium Leak Test that it represented it had performed. As a result of the Defendant's acts and omissions, the Government did not receive the hermetically sealed LN-120Gs for which it bargained, and has also incurred substantial repair costs as a result of the nonconformance.

5. The FCA provides that any person who knowingly submits or causes to be submitted a false or fraudulent claim to the United States for payment or approval is liable for a civil penalty of up to $11,000 for each such violation plus three times the amount of the damages sustained by the United States. The FCA allows any person having information regarding a false or fraudulent claim against the United States to bring an action on behalf of himself and the United States and to share in any recovery. The complaint is to be filed under seal for 60 days without service on the defendant to enable the United States the opportunity to conduct an investigation and determine whether to join the action.

6. Based on these provisions, Relator Peter Matthews seeks to recover damages and civil penalties arising from Defendant Northrop knowingly submitting claims for payment for LN-120Gs that failed to conform to material contractual requirements and making false statements and records material to those claims for payment.

## II. PARTIES

7. Relator Peter Matthews ("Relator") is a resident of South Weber, Utah. Relator worked as a multidiscipline engineer at Northrop's Salt Lake City, Utah facilities from 2005 until he was laid off in July 2014.

8. Relator's first assignment at Northrop was to help bring the LN-120G to production. His responsibilities included writing assembly instructions for the

LN-120G. He later worked on various assignments related to repairing and reworking the LN-120Gs that were returned to Northrop after problems arose in the field.

9. Defendant Northrop Grumman Corporation is incorporated in Delaware and maintains its headquarters in Falls Church, Virginia. Northrop provides a wide range of products and services in the aerospace, electronics, and shipbuilding fields. Northrop's products are used in military air, land, sea and space systems. The LN-120G was developed by Northrop's Navigation Systems division, which is based in Woodland Hills, California.

## III. JURISDICTION AND VENUE

10. This Court has jurisdiction over the subject matter of this False Claims Act action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732(a), which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

11. Although the issue is no longer jurisdictional, to Relator's knowledge there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint within the meaning of 31 U.S.C. § 3730(e)(4). Moreover, whether or not such a disclosure has occurred, Relator would qualify as an "original source" of the information on which the allegations in this Complaint are based. Before filing this action, Relator voluntarily disclosed to the Government the information on which the allegations or transactions in this Complaint are based. Additionally, Relator has direct and independent knowledge about the misconduct alleged herein and that knowledge is independent of and materially adds to any publicly disclosed allegations or transactions relevant to his claims.

12. This Court has personal jurisdiction over Northrop pursuant to 31 U.S.C. § 3732(a), as Northrop may be found in, resides in, transacts business in, and committed acts related to the allegations in the Complaint within this judicial

district.

13. Venue is proper pursuant to 31 U.S.C. § 3732(a), because Northrop may be found in, resides in, transacts business in and committed acts related to the allegations in the Complaint within this judicial district.

## IV. BACKGROUND

### A. The LN-120G

14. The LN-120G is a sophisticated navigational system for military aircraft. The LN-120G uses star tracking capability and can perform during daylight and in areas where GPS is unavailable or jammed. The LN-120G is employed on the RC-135, a reconnaissance plane used by the United States Air Force to collect, analyze, and disseminate signals intelligence in real time. The system provides precise navigational guidance to the plane, which enables the plane to locate the source of the signals it collects with great accuracy. The Air Force uses that real-time location information to identify targets on the ground to other aircraft, as well as to warn about threatening activity.

15. LN-120G system is contained in an aluminum box, or "chassis," that is 18.2 inches by 14.3 inches by 14.4 inches. The chassis contains a telescope for star tracking, the mechanical equipment for rotating the telescope, including the azimuth cartridge and slip rings, and electronic components for transmitting the information obtained from the telescope. The total assembly weighs approximately104 pounds.

16. Each RC-135 plane has three LN-120Gs available, so when a unit is removed for an upgrade or due to a failure, it can be replaced with another unit.

### B. The Helium Leak Test for Hermeticity

17. The LN-120G is filled with nitrogen to ensure that its components operate in an environment that is free from moisture that could degrade the components. If the LN-120G box leaks, the nitrogen can escape, and air, which is heavier and contains water vapor, will displace it.

18. Systems containing electronic components for use in military systems have historically required a "hermetic" seal to keep moisture out of the system. Moisture creates the possibility for corrosion or other chemical reactions that may degrade the performance of a device and lead to failure. Corrosion is induced by the condensation of moisture and accelerated by many other factors. Prior to the implementation of military hermeticity test methods in the late 1970s, there were numerous military system problems due to microcircuit corrosion. Other problems that can be caused by moisture include electrical leakage and stiction, which describes the condition when more force is necessary to turn a component than should be required. While some minimal leaking may be inevitable in any system, the critical issue is the rate of leakage over time, as that determines the potential risk from excess moisture entering the system.

19. The Military Standard Test Method for hermeticity is MIL-STD 833, Test Method ("TM") 1014. TM 1014 provides several methods for determining the effectiveness of a seal, but the most common method is to measure the rate at which helium escapes. The TM 1014 specification is based on a maximum air leak rate.

20. The assembly drawings for the LN-120G specify a maximum leak rate of 100 micron cubic feet per hour. The assembly instructions require that a Helium Leak Test be performed to determine whether the LN-120G meets the specification in the assembly drawings. The instructions substitute a specific leak test for a MIL-STD test. The assembly instructions provide that the test must be performed pursuant to Manufacturers Test Procedure ("MTP") 131795. The instructions further provide that

> THE LEAK RATE FROM THE ASSEMBLY SHALL NOT EXCEED .001 STD CC PER SECOND (100 MICRON CUBIC FEET PER HOUR) USING FN 18 AT 3 PSIG $\pm$ 0.5 PSIG.

21. MTP 131795 sets forth a Helium Leak Test for the LN-120G that

"presents a procedure to meet the leak requirements of the assembly drawing." The test requires evacuating the LN-120G, then filling it with 100% helium and placing the LN-120G in a vacuum chamber attached to a helium leak detector. The chamber is then evacuated and any helium leaking from the pressurized box is measured by the leak detector. A leak rate of over $1x1^{-3}$mbar l/sec is considered a failure. If there is a failure of the test, MTP 131795 requires that "rework to repair leak or replacement of defective parts will be required."

22. The test equipment for the Helium Leak Test is the Dupont 025A Test Port, which includes a bell jar that fits over the test unit:

The LN-120G is placed under the bell jar and the leak tester is activated to measure the leak rate. The reading may not be greater than $1x1^{-3}$ mbar l/sec. MTP 131795 provides that results should be recorded and copies of all test data sheets retained.

23. While other types of testing, such as the dewpoint tester, can provide some information about leaks, such as whether a leak may exist, they cannot determine the leak rate and therefore cannot substitute for the required Helium Leak Test. Even if other tests were performed, they would not have provided the information that would have been provided by the required test, and in fact the

tests that Northrop performed instead of the Helium Leak Test did not reveal the rate of leaking that the LN-120Gs were experiencing that caused, or partly caused, premature failures.

**C. Delivery of the LN-120Gs and First Signs of Failures**

24. The first LN-120Gs were delivered to the Government in or around 2008.

25. After the LN-120Gs were delivered, they began to be returned to Northrop with various failures that were caused, or partly caused, by moisture inside the LN-120G.

**1. The Slip Rings**

26. In or around 2009, some of the LN-120Gs were returned to Northrop for repair because of slip ring failures. The slip rings are electromechanical devices that enable the transmission of electrical information while the telescope is rotating. The slip rings were experiencing stiction, which meant it was taking more force than should be required for them to rotate. The slip rings used in the LN-120Gs were manufactured by Moog, Inc. ("Moog"), a designer and manufacturer of aerospace control systems. Moog examined the rings and maintained that the stiction that the rings were experiencing occurred after the delivery of the rings and was not a defect in the rings as delivered to Northrop. Ultimately, four of the five slip rings in the LN-120Gs were removed from all of the existing systems and replaced with new assemblies. Subsequently, the LN-120Gs were returned because of stiction problems with the fifth slip ring and that slip ring is now being reworked.

**2. The Azimuth Cartridge**

27. In or about 2012-2013, LN-120Gs were returned with problems with the azimuth cartridge. The azimuth cartridge is the turntable-like platform on which the telescope sits inside the LN-120G. The cartridge was also experiencing stiction. Northrop sent the cartridges to General Dynamics, which was the vendor

for this part. General Dynamics investigated the problem and reported in the Fall of 2013 that it found "grit and grime" in the inner workings of the azimuth cartridge that should not have been there and that may have contributed to the stiction problems with the cartridge.

**3. The Desiccant**

28. In or around 2013, Relator had discovered that the desiccant in some of the LN-120Gs had leaked from the desiccant cartridge. The desiccant is contained in a poly carbonite tube inside the LN-120G, with a thin wafer stopper on each end of the tube and a retaining clip that keeps the stoppers in place. The desiccant was intended to remove any potential moisture from inside the LN-120G, but was instead leaking out of the tube and into the LN-120G. The Relator found that the wafer stoppers on the tube that contained the desiccant were severely discolored and had visible cracks on the inside and outside, and that desiccant had leaked through them.

**4. The Aluminum Chloride**

29. In or around December 2013, Dale Walters, a Northrop engineer who was working in the field at Offutt Air Force Base in Nebraska, informed the Relator that he had noticed a white powder inside some of the LN-120Gs. Walters and the Relator compared what they were seeing and realized Walters was seeing a different substance than desiccant. Walters sent a unit with the white substance back to Northrop's Salt Lake Facility and Relator confirmed the presence of the white powder. Relator reported to his supervisor, Lonnie Logan, the Engineering Manager, that there was white powder inside the LN-120G. Logan examined the powder and concurred with the Relator that the condition was likely due to corrosion.

30. Logan directed the Relator to prepare a Technical Problem Summary ("TPS"), which he did. The TPS, entitled "white powder" was submitted to the Northrop Project Office in Woodland Hills, which put together a cross-functional

team led by Jean-Michel Guerin. The team included Relator, Relator's supervisor, Lonnie Logan, David Macdonald, a design engineer in Northrop's Woodland Hills facility, and Barbara Kurtin, a materials and processes engineer. The team had daily inter-plant conferences to address the problem.

31. As a first step in assessing the problem, Relator sent a sample of the white powder to a lab, which reported back that the substance contained aluminum chloride. Aluminum chloride can form when aluminum metal reacts with chlorine. Ms. Kurtin concluded that a water source was drawing aluminum out of the LN-120G chassis. Relator confirmed with the project team that Northrop did not use chlorine in any of the processes used in producing or repairing the LN-120G. Mr. Macdonald later forwarded Relator an email from the vendor that supplied the chassis, acknowledging its use of chlorine in the chassis welds. Although chlorine should not have been used in the welds, it would not have had the corrosive effect on the aluminum without the presence of moisture.

**D. <u>Discovery of the Failure to Perform the Helium Leak Test</u>**

32. In or around January 2014, the two Northrop employees tasked with testing the LN-120G, Albert Thompson and Delyle Rall, told Relator that a 40-year old dewpoint tester machine they had been using to test the dewpoint inside the LN-120G was being taken out of service, and they were concerned that they would no longer have access to the machine. In response, the Relator questioned why they cared because the dewpoint test was not a required test for the LN-120G. The dewpoint test indicates the presence of moisture inside a compartment by taking a snapshot of moisture content at a particular time. The dewpoint test does not measure moisture over time, and therefore does not provide information about the leak rate. The test also depends on the subjective judgment of the tester, which makes it too imprecise to determine hermeticity. The required test, the Helium Leak Test, measures the leak rate and uses objective criteria to ensure the LN-120G meets the required hermeticity. In response to the Relator's questions,

Thompson and Rall ultimately conceded that the Helium Leak Test had *never* been done and could not have been done because the LN-120G did not fit in the leak test machine. Northrop's helium leak test machine, the Dupont 25A Test Port, was previously used to perform the helium leak test on the guidance system for the Tomahawk cruise missile. Northrop had never purchased a helium leak tester that would fit the LN-120G. A new helium leak tester would have cost approximately $15,000.

33. Notwithstanding that the Helium Leak Test had never been done, and that Northrop lacked the equipment to perform it, Northrop employees, including Thompson, Rall, and Todd Donaldson, had certified that the Helium Leak Test had been performed for each LN-120G. When an LN-120G was returned for repairs, Northrop employees, including Thompson and Rall, recertified that the test had been done, even though it had not been done.

34. The Relator reported to his boss, Lonnie Logan, that the required Helium Leak Test had never been performed. Logan inquired whether the Relator was sure the test was a requirement, and when Relator showed him that it was. Logan informed Relator that he would talk to Glenn Kemp, the manufacturing manager for that area.

35. Both Logan and the Relator raised with Kemp the failure to perform the required test. Nevertheless, Northrop did not start testing the units and continued to certify repaired units as having been tested when in fact they had not been.

36. Moreover, armed with the knowledge that the LN-120Gs had never been subjected to the Helium Leak Test, and were continually experiencing failures associated with the presence of moisture inside the LN-120Gs, Northrop failed to take reasonable steps to address the problem. Northrop did not replace the aluminum chassis. Instead, Northrop simply cleaned off the visible corroded aluminum and coated the parts of the chassis where corrosion was seen with an

epoxy to seal the welds from further exposure to moisture. However, without fully taking apart an LN-120G, not all of the corroded parts could be examined and sealed. Sealing the welds also does not fix the problem underlying the corrosion, which is that the LN-120G chassis is not properly sealed and that moisture is able to enter the system.

37. Upon information and belief, Northrop never informed the Government of the failure to perform the Helium Leak Test, the misrepresentations regarding the test, the cause of the corrosion in the chassis or the method of addressing it.

38. Costs of the repairs and reworking of the LN-120Gs caused by, or partly caused by, the moisture inside the chassis were charged to the Government. The repair work was frequently discussed as a big revenue producer for Northrop.

## V. <u>DEFENDANT'S FALSE STATEMENTS AND FALSE CLAIMS</u>

39. By certifying that the required leak testing had been done on each of the LN-120Gs delivered to the Government, Northrop knowingly made and used false statements and records material to false claims for payment by the United States. The statements and records were false in that Northrop had never performed the Helium Leak Test and could not have performed the test because it lacked the necessary equipment. The statements were material because a failure to comply with a drawing requirement designed to ensure the LN-120G was free from moisture-related failures during its useful life would have a natural tendency to affect or be capable of affecting the government's payment decision.

40. The claims for payment for the LN-120G were knowingly false. Northrop failed to comply with a requirement that was material to the government's purchase of the LN-120Gs. The government bargained not just for performance of the leak test but for the confidence that the LN-120Gs would not suffer failures before 4,000 hours of useful life. Instead, the LN-120Gs have suffered numerous failures, caused or partly caused by moisture, after 1,500 hours

or less of service. Employees, including supervisory level employees at Northrop, had actual knowledge that Northrop had not performed the test and misrepresented that it had done so and also failed to make reasonable and prudent inquiries under the circumstances.

41. Northrop was under a mandatory obligation to disclose its false statements and claims to the Government. Under the FAR mandatory disclosure rules for contracts over $5 million dollars that took effect in December 2008, a contractor must make written disclosure to the Government whenever in connection with the performance of a contract the contractor has credible evidence that an employee, agent or subcontractor has committed a violation of the civil False Claims Act or certain other laws. 48 C.F.R. 52.203-13(b)(3). Northrop had credible evidence of a violation of the False Claims Act in that it was aware that an employee or employees had made and were making false statements and records about compliance with the Helium Leak Test requirement which was material to claims for payment and submitting false claims for payment for the LN-120Gs and related repair work. Upon information and belief, Relator alleges that Northrop failed to comply with this mandatory disclosure requirement.

**COUNT I**

**Federal False Claims Act**

**(31 U.S.C. § 3729(a)(1)(A))**

42. Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 41 of this Complaint.

43. This is a claim for treble damages and forfeitures under the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

44. Through its failure to test the LN-120G as required and delivery of a nonconforming product, Defendant and its agents, employees and co-conspirators, knowingly presented and caused to be presented to the Government false and fraudulent claims for payment for the LN-120Gs and repairs to the LN-120G when

the Defendant knew, recklessly disregarded, or acted in deliberate ignorance of the fact that the LN-120Gs did not conform to material contractual requirements.

45. The United States, unaware of the falsity of the claims submitted by Defendant—or of the failure to disclose material facts—made payments it would not have made if it had known the truth.

46. By reason of the Defendant's false claims, and omissions, the United States has been damaged in the amount of tens of millions of dollars.

**COUNT II**

**Federal False Claims Act**

**(31 U.S.C. § 3729(a)(1)(B))**

47. Relator realleges and incorporates by reference the allegations made in Paragraphs 1 through 46 of this Complaint.

48. This is a claim for treble damages and forfeitures under the Federal False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

49. Through its failure to test the LN-120G as contractually required and delivery of a nonconforming product, Defendant and its agents, employees and co-conspirators, knowingly made false records and statements and omitted facts material to claims for payment and in order to obtain payment for the LN-120Gs and repairs to the LN-120Gs when Defendant knew, acted in deliberate ignorance of, or recklessly disregarded that the LN-120Gs did not conform to material contractual requirements.

50. The United States, unaware of the falsity of the records, statements, and claims made or submitted by Defendant—or of the failure to disclose material facts—made payments it would not have made if it had known the truth.

51. By reason of the Defendant's false records, statements, claims, and omissions, the United States has been damaged in the amount of tens of millions of dollars.

**PRAYER**

WHEREFORE, Relator prays for judgment against the Defendant as follows:

1. that the Defendant cease and desist from violating 31 U.S.C. § 3729, *et seq.*;

2. that the Court enter judgment against Defendant in an amount equal to three times the amount of damages sustained by the United States as a result of the Defendant's actions, as well as a civil penalty against each Defendant of $11,000 for each violation of 31 U.S.C. § 3729;

3. that Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

4. that Relator be awarded all costs and expenses of this action, including attorneys' fees; and

5. that the United States and Relator receive such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated: November 12, 2014.

PHILLIPS & COHEN LLP

By: [signature]
Claire M. Sylvia

Attorneys for *Qui Tam* Plaintiff
Peter Matthews

ORIGINAL

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

United States ex rel. Peter Matthews

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

Northrop Grumman Corporation

(b) County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant Los Angeles Cty
*(IN U.S. PLAINTIFF CASES ONLY)*

(c) Attorneys (*Firm Name, Address and Telephone Number*) If you are representing yourself, provide the same information.

Eric Havian (SBN 102295), Claire Sylvia (SBN 138990), and Edward Arens (SBN 25915)
Phillips & Cohen LLP, 100 The Embarcadero, suite 300, San Francisco, CA 94105
Tel: (415) 836-9000

Attorneys (*Firm Name, Address and Telephone Number*) If you are representing yourself, provide the same information.

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☒ 1. U.S. Government Plaintiff
☐ 3. Federal Question (U.S. Government Not a Party)
☐ 2. U.S. Government Defendant
☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only (Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding ☐ 2. Removed from State Court ☐ 3. Remanded from Appellate Court ☐ 4. Reinstated or Reopened ☐ 5. Transferred from Another District (Specify) ☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No ☐ **MONEY DEMANDED IN COMPLAINT:** $ treble damages

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)

Federal False Claims Act, 31 U.S.C. §§ 3729 et seq. Action to recover damages and penalties for false claims submitted to the U.S.

**VII. NATURE OF SUIT** (Place an X in one box only).

**OTHER STATUTES**
☒ 375 False Claims Act
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce/ICC Rates/Etc.
☐ 460 Deportation
☐ 470 Racketeer Influenced & Corrupt Org.
☐ 480 Consumer Credit
☐ 490 Cable/Sat TV
☐ 850 Securities/Commodities/Exchange
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Info. Act
☐ 896 Arbitration
☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.)
☐ 153 Recovery of Overpayment of Vet. Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment

**REAL PROPERTY CONT.**
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Fed. Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury-Med Malpratice
☐ 365 Personal Injury-Product Liability
☐ 367 Health Care/Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**IMMIGRATION**
☐ 462 Naturalization Application
☐ 465 Other Immigration Actions

**TORTS PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**CIVIL RIGHTS**
☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/Accommodations
☐ 445 American with Disabilities-Employment
☐ 446 American with Disabilities-Other
☐ 448 Education

**PRISONER PETITIONS**
**Habeas Corpus:**
☐ 463 Alien Detainee
☐ 510 Motions to Vacate Sentence
☐ 530 General
☐ 535 Death Penalty
**Other:**
☐ 540 Mandamus/Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee Conditions of Confinement

**FORFEITURE/PENALTY**
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical Leave Act
☐ 790 Other Labor Litigation
☐ 791 Employee Ret. Inc. Security Act

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405 (g))
☐ 864 SSID Title XVI
☐ 865 RSI (405 (g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS-Third Party 26 USC 7609

**FOR OFFICE USE ONLY:** Case Number: CV14-08755

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**VIII. VENUE:** Your answers to the questions below will determine the division of the Court to which this case will be initially assigned. This initial assignment is subject to change, in accordance with the Court's General Orders, upon review by the Court of your Complaint or Notice of Removal.

| **QUESTION A: Was this case removed from state court?** ☐ Yes ☒ No | STATE CASE WAS PENDING IN THE COUNTY OF: | INITIAL DIVISION IN CACD IS: |
|---|---|---|
| If "no," skip to Question B. If "yes," check the box to the right that applies, enter the corresponding division in response to Question E, below, and continue from there. | ☐ Los Angeles, Ventura, Santa Barbara, or San Luis Obispo | Western |
| | ☐ Orange | Southern |
| | ☐ Riverside or San Bernardino | Eastern |

| **QUESTION B: Is the United States, or one of its agencies or employees, a PLAINTIFF in this action?** ☒ Yes ☐ No | **B.1.** Do 50% or more of the defendants who reside in the district reside in Orange Co.? *check one of the boxes to the right* → | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
|---|---|---|
| | | ☒ NO. Continue to Question B.2. |
| If "no," skip to Question C. If "yes," answer Question B.1, at right. | **B.2.** Do 50% or more of the defendants who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.) *check one of the boxes to the right* → | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| | | ☒ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| **QUESTION C: Is the United States, or one of its agencies or employees, a DEFENDANT in this action?** ☐ Yes ☒ No | **C.1.** Do 50% or more of the plaintiffs who reside in the district reside in Orange Co.? *check one of the boxes to the right* → | ☐ YES. Your case will initially be assigned to the Southern Division. Enter "Southern" in response to Question E, below, and continue from there. |
|---|---|---|
| | | ☐ NO. Continue to Question C.2. |
| If "no," skip to Question D. If "yes," answer Question C.1, at right. | **C.2.** Do 50% or more of the plaintiffs who reside in the district reside in Riverside and/or San Bernardino Counties? (Consider the two counties together.) *check one of the boxes to the right* → | ☐ YES. Your case will initially be assigned to the Eastern Division. Enter "Eastern" in response to Question E, below, and continue from there. |
| | | ☐ NO. Your case will initially be assigned to the Western Division. Enter "Western" in response to Question E, below, and continue from there. |

| **QUESTION D: Location of plaintiffs and defendants?** | A. Orange County | B. Riverside or San Bernardino County | C. Los Angeles, Ventura, Santa Barbara, or San Luis Obispo County |
|---|---|---|---|
| Indicate the location(s) in which 50% or more of *plaintiffs who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☐ |
| Indicate the location(s) in which 50% or more of *defendants who reside in this district* reside. (Check up to two boxes, or leave blank if none of these choices apply.) | ☐ | ☐ | ☒ |

| **D.1. Is there at least one answer in Column A?** | **D.2. Is there at least one answer in Column B?** |
|---|---|
| ☐ Yes ☒ No | ☐ Yes ☒ No |
| If "yes," your case will initially be assigned to the SOUTHERN DIVISION. Enter "Southern" in response to Question E, below, and continue from there. If "no," go to question D2 to the right. → | If "yes," your case will initially be assigned to the EASTERN DIVISION. Enter "Eastern" in response to Question E, below. If "no," your case will be assigned to the WESTERN DIVISION. Enter "Western" in response to Question E, below. ↓ |

| **QUESTION E: Initial Division?** | INITIAL DIVISION IN CACD |
|---|---|
| Enter the initial division determined by Question A, B, C, or D above: → | WESTERN |

**QUESTION F: Northern Counties?**

Do 50% or more of plaintiffs or defendants in this district reside in Ventura, Santa Barbara, or San Luis Obispo counties? ☐ Yes ☒ No

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL COVER SHEET**

**IX(a). IDENTICAL CASES:** Has this action been previously filed **in this court**? [X] NO [ ] YES

If yes, list case number(s): ______

**IX(b). RELATED CASES:** Is this case related (as defined below) to any civil or criminal case(s) previously filed **in this court**? [X] NO [ ] YES

If yes, list case number(s): ______

**Civil cases** are related when they (check all that apply):

- [ ] A. Arise from the same or a closely related transaction, happening, or event;
- [ ] B. Call for determination of the same or substantially related or similar questions of law and fact; or
- [ ] C. For other reasons would entail substantial duplication of labor if heard by different judges.

Note: That cases may involve the same patent, trademark, or copyright is not, in itself, sufficient to deem cases related.

**A civil forfeiture case and a criminal case** are related when they (check all that apply):

- [ ] A. Arise from the same or a closely related transaction, happening, or event;
- [ ] B. Call for determination of the same or substantially related or similar questions of law and fact; or
- [ ] C. Involve one or more defendants from the criminal case in common and would entail substantial duplication of labor if heard by different judges.

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):** [signature] DATE: 11·12·14

**Notice to Counsel/Parties:** The submission of this Civil Cover Sheet is required by Local Rule 3-1. This Form CV-71 and the information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. For more detailed instructions, see separate instruction sheet (CV-071A).

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |